**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 4:14-po-0002-SAO |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OPINION** |
| | ) | |
| vs. | ) | **(Trial by Court)** |
| | ) | |
| CLARENCE ALEXANDER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### INTRODUCTION

The United States charged Mr. Clarence Alexander ("Clarence Alexander") with one count of violating 50 Code of Federal Regulations (C.F.R.) § 100.19(g)(1) for violating a closure order on or about July 14, 2013 within the Yukon River Slough near Fort Yukon, Alaska.[1] Prior to trial, Clarence Alexander indicated his intent to challenge the validity of the underlying regulation.[2] However, Clarence Alexander moved the court to hold a trial to determine whether he was guilty of the allegation first, but if found guilty, to provide him an opportunity to prove the underlying

---

[1] Alexander was charged by Violation Notice from the U.S. Fish and Wildlife Service, Violation Number W0981382.

[2] Defense asserts "the regulation that is the basis for the citation issued to him is invalid as applied to this case because of the failure of the Federal Subsistence Board to implement the priority for subsistence used mandated by the Alaska National Interest Lands Conservation Act (ANILCA) Section 804." Unopposed Motion to Bifurcate Trial and For Continuance, Dkt. 13, p. 1-2.

1

regulation is invalid.[3] The court granted Clarence Alexander's request and conducted a bench trial, ordered arguments submitted in writing, and issues this memorandum opinion.

At trial, the following testified for the United States: Officer Mimi Thomas ("Officer Thomas"), a wildlife officer for Yukon Flats National Wildlife Refuge; Mr. Paul Williams, Sr. ("Williams"), the boat pilot; and Mr. Fred Bue ("Bue"), the Yukon Area In-Season Fisheries Manager. Clarence Alexander testified in his defense, along with witnesses Robert Alan Rosenfeld and Edward Clarence Alexander ("Edward Alexander"). The court admitted Government Exhibits 1-4 and Defense Exhibits A-C at trial. In argument, defense subsequently moved for a finding that the United States violated <u>Brady</u>[4] and Federal Rule of Criminal Procedure 16(a)(1)(E)(i) and (ii).

Upon due consideration of the evidence and the arguments of the parties, the court finds reasonable doubt as to whether Clarence Alexander violated 50 C.F.R. § 100.19(g)(1) and therefore finds Clarence Alexander Not Guilty of violating 50 C.F.R. § 100.19(g)(1). The court does not find a violation of the prosecutor's duty to disclose <u>Brady</u> material. The court finds a

---

[3] <u>Unopposed Motion to Bifurcate Trial and For Continuance</u>, Dkt. 13, p. 3. and minute entry from Hearing on Motion to Bifurcate trial, Dkt. 17.

[4] <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963). See also <u>Hein v. Sullivan</u>, 601 F.3d 897, 906 (9th Cir. 2010)

violation of F.R.C.P. 16 occurred.  As a remedy, the court did not consider Government Ex. 3 as evidence in this case.

## FINDINGS OF FACT

The U.S. Department of the Interior Fish and Wildlife Service Federal Subsistence Board ("Federal Subsistence Board" or "Board") is responsible for administering the subsistence taking and uses of fish and wildlife on public lands,[5] including the Yukon Flats National Wildlife Refuge.[6]  Clarence Alexander is charged with violating 50 C.F.R. § 100.19(g), which bars the taking of fish and wildlife "in violation of any restriction, closure, or change authorized by the Board."

On July 12, 2013, the Federal Subsistence Board issued an announcement that divided Subdistrict 5-D of the Upper Yukon River into the Lower, Middle, and Upper areas.[7]  "The Announcement" or "Closure Order" included a closure of subsistence salmon fishing on portions of the Upper Yukon River and provided, in relevant part:

> Subsistence salmon fishing is currently open 7 days per week, 24 hours a day and gillnets are restricted to 6-inch or smaller mesh size.  Effective 6:00pm Sunday, July 14,

---

[5] 50 C.F.R. § 100.10(a)

[6] 50 C.F.R. § 100.3(c) The regulations contained in this part apply on all public lands, excluding marine waters, but including all inland waters, both navigable and non-navigable, within and adjacent to the exterior boundaries of the following areas:… 50 C.F.R. § 100.3(c)(29)Yukon Flats National Wildlife Refuge;"

[7] Government Ex. 2 at 2.

subsistence salmon fishing will close to protect the first pulse of Chinook salmon and will remain closed until further notice.[8]

The Announcement also provided "[d]uring subsistence salmon fishing closures, fish wheels may not be operated and gillnets with a mesh size greater than four inches and a length greater than 60 feet must be removed from the water."[9]

The Announcement from July 12, 2013 was a joint State and Federal news release announcing a fisheries management action to be implemented, stating the fishing closure and areas covered.[10] The announcement was issued under the authority of the Federal Subsistence Board even though the announcement was listed on joint letterhead. The state is the lead management agency, but the U.S.

---

[8] Government Ex. 2 at 2.

[9] Government Ex. 2 at 3.

[10] The Federal Subsistence Board delegates authority to the in-season Fisheries Manager for U.S. Fish and Wildlife Service to carry out federal regulations and make decisions regarding closures in season. The in-season fisheries manager for U.S. Fish and Wildlife Service works closely with the in-season manager for the State of Alaska to coordinate their management because the Yukon River covers a series of State and Federal water jurisdictions. The Announcement, at Government Ex. 2, has in bold above the letterhead, "The Alaska Department of Fish and Game Division of Commercial Fisheries." The letterhead on the notice lists the Alaska Department of Fish and Game and the U.S. Department of Interior Fish and Wildlife Service and the last line of the notice on page 3 states "This has been an announcement by the Alaska Department of Fish and Game in cooperation with the U.S. Fish and Wildlife Service."

Fish and Wildlife service can supersede state authority if necessary.

Clarence Alexander is seventy-five years old and lived in Fort Yukon his whole life. Clarence Alexander is Chief Clarence Alexander, one of the co-founders of the Yukon River Intertribal Watershed Council and is currently chairman.[11] The Watershed Council was formed to keep the Yukon River clean for future generations so that all life can thrive; it is comprised of 70 indigenous governments from one end of the Yukon River to the other.

During much of his life, Clarence Alexander fished in the area, primarily for others in the community. Clarence Alexander frequently caught 30 to 40 fish a day with Ed Alexander, his son, and would distribute them to members of the community. Ed Alexander frequently helped Clarence Alexander fish, especially in 2013 because Clarence Alexander suffered from a heart condition and had stints placed in his heart in the spring of 2013. In July, 2013, Clarence Alexander was taking several medications and was not able to lift over five pounds because of his medical conditions. In previous years, Ed and Clarence Alexander shared the workload of fishing, but in 2013 most of the workload fell to Ed Alexander.

---

[11] Several members of his community have a high regard for the character and truthfulness of Clarence Alexander.

Ed and Clarence Alexander harvested declining numbers of salmon each year since approximately 2008.[12]  Ed and Clarence Alexander caught very little or no salmon in 2013, with 2013 and 2014 being the worst two years for taking salmon.  Closure orders were used steadily on that portion of the Yukon River from 2008 through 2013.  Usually the closures were announced on a sign or on the radio.

The 2013 Yukon River Summer Salmon Fishery News Release #58 Summer Announcement #53, Subdistrict 5-D Subsistence Fishing Schedule was issued on Friday, July 12, 2013.[13]  The press release issued through the State of Alaska distribution system.  The Tribal Council contacted Fred Bue through email and requested delaying the fishing closure.  Several individuals usually knew of any closure or upcoming closure information in Fort Yukon in addition to the State of Alaska distribution system.  James Kelly, in the Natural Resources Department of The Council of Athabascan Tribal Governments was usually aware of closures or upcoming closures and resided in the area.  Andrew Firmin, Director of Natural Resources for the Native Village of Fort Yukon was also knowledgeable about closures or upcoming closures and resided in the area.  A toll-

---

[12] 2008 was the first year there was a subsistence closure, but even in 2008 the Alexanders caught seventy-five percent of their subsistence harvest.

[13] Government Ex. 2.

free number listed on the Closure notice itself could have provided information about the closures; the toll-free number was attainable from either Mr. Kelly or Mr. Firmin or the Alaska Department of Fish and Game website.[14]

No one contacted Clarence Alexander personally regarding the closure notice prior to 6:00pm on July 14, 2013. Clarence Alexander did not see the closure notice, Government Ex. 2, prior to July 14, 2013 nor heard of the closure notice on the radio.

Ed Alexander had difficulty identifying a posting of the July 12, 2013 closure. Ed Alexander knew a closure for July 14, 2013 existed however before 6:00pm he did not know the time of the closure.[15] Ed Alexander tried to see a posting of the notice prior to 6:00pm on July 14, 2013, but could not find one posted in the usual places.[16] When Ed Alexander asked other fishermen about the notice, Ed heard different times for the July 14, 2013 closure

---

[14] The closure release was issued on a Friday, possibly in the afternoon. It was unknown whether Mr. Firmin or Mr. Kelly were actually available to answer questions on Friday, Saturday, or Sunday.

[15] Ed Alexander did not contact the village council office to obtain the 800 number regarding closures, or call the village contact office to obtain Officer Thomas's phone number to ask her the closure time, or try to contact the City's natural resources department.

[16] Ed Alexander found copies of past closures routinely located at the local 'AC store', radio station, or gas station. However, Ed Alexander could not find a copy of one at either of those locations or the Fish and Wildlife Service station on July 14, 2013.

such as 6:00pm, 8:00pm, and even midnight. Ed and Clarence Alexander decided late in the day on July 14, 2013 they would try to take down the net before 6:00pm.

Ed Alexander served as second chief of the Gwichyaa Zhee Gwich'in Tribal Government in 2013. He was heavily involved in tribal government; he attended council meetings and provided guidance on various issues. The Tribal Government frequently discussed fishing closure issues and did so at their July 12, 2013 meeting. The Gwichyaa Zhee Gwich'in Tribal Government passed a resolution on July 12, 2013 requesting an extension for the subsistence fisheries for Fish Wheels and 7.5 Inch Fish nets in Subdistrict 5-D.[17] Ed Alexander attended the July 12, 2013 meeting, but did not recall discussing the Announcement at any time between July 12, 2013 and July 14, 2013 at 6:00pm.

Officer Thomas did not see any other fishermen in violation of the 6:00pm closure on July 14, 2013 in Subdistrict 5-D Middle while she was traveling on the River.

Clarence and Ed Alexander placed two nets on the Yukon River and one at the mouth of the Porcupine River for the purpose of

---

[17] Government Ex. 4, Resolution No. 13-19, Fisheries Extension July 15-17, 2013. It was unclear whether the Resolution passed on July 12, 2013 requested an extension of Summer Announcement #53. The Resolution requested an extension "for subsistence Fisheries from Monday to Wednesday (July 15-17, 2013) for Fish Wheels and 7.5 Fish nets in Subdistrict 5-D." However, none of the Closures listed in Government Ex. 2 began on Monday, July 15, 2013.

catching fish.[18]  Clarence and Ed Alexander checked their fishnets

twice daily so the fish did not spoil or the net fill with silt.

On the morning of July 14, 2013, Clarence and Ed Alexander checked

their nets around 7:00am or 8:00am.  The net on the Porcupine was

located on Clarence Alexander's property on the opposite side of

Joe Peter's Slough.[19]  Clarence and Ed Alexander added homemade

weights to the bottom of the net including a big piece of steel at

the end, which weighed over 100 pounds.  These weights were on the

line in the water when Clarence and Ed Alexander checked the net

in the morning.  However they saw the net "not sitting right" so

they reset the net, which only took a few minutes.[20]  The Porcupine

River at the time appeared clear and free of debris.

Clarence and Ed Alexander returned to the same net later in

the day to check it.[21]  Under normal circumstances, they thought

15 minutes would be sufficient time for them to remove the net

---

[18] Depicted in Government Ex. 1 and Defense Ex. C.  All nets were located in the Yukon Flats National Wildlife Refuge.  A sign placed on the shore identified the net as Clarence's and ownership was not disputed during trial.

[19] Defense Ex. C shows the layout drawn by Ed Alexander.

[20] A set net has to hang loosely so the fish can get into the net. If the net is set too tightly, because the current is too fast or the net is full of debris, it will not be able to catch fish.  It took Clarence and Ed Alexander approximately fifteen minutes to travel between their residence and the net location.

[21]  Ed and Clarence Alexander recall leaving Fort Yukon in their boat around 5:30pm and arriving at the site of the net around 5:45pm.  However, neither Ed nor Clarence Alexander had a time keeping piece on them.

from the water. However, the channel had changed and it forced a great amount of drift debris into the net.[22] Once Clarence saw his net with all the wood in it, he knew he would not have it out of the water in fifteen minutes and that it would take much longer.[23] Clarence Alexander drove the boat, while Ed Alexander rode as a passenger to the side of their net.  When they approached the net they saw the net was so full of debris, they were surprised the net was still there.[24]  Ed Alexander had never seen that much debris in a net before; their net contained whole willow branches and trees, some with the bark still on them.[25]

Ed and Clarence Alexander pulled up portions of the net into their boat and tried to get some of the debris loose.  They dislodged some pieces of debris, but not most of it.  They tried to untie one side so the debris could fall out downstream, but the

---

[22] Officer Thomas states by the time she arrived the net was not pinned up against the bank, but out far enough in the water to catch a fish if a fish came toward it.  She also stated she did not see huge logs and trees in the net and that it did "not look that bad" and that the clean part of the net was going back in the water – but they were cleaning the net.  The Alexanders had already been working on retrieving the net by this time.

[23] They saw the main flow of the river with lots of drift coming down, meaning trouble for the net. On this particular day the 'drift' floating down contained regular drift and larger debris. These items did not appear to be in the water when they visited the net in the morning of July 14, 2013.

[24] In 2013 the rivers contained more drift debris than prior years because of high water.

[25] Ed Alexander estimated the net contained over 1,000 pounds of drift materials and was surprised the anchoring rope had held.

net was so heavy they could not untie it and swing the end around to let the debris fall out.[26]  With Clarence Alexander driving the boat, Ed Alexander tried a couple different methods to empty the net so they could retrieve it and remove it from the water, but they were unsuccessful.[27]

Ed Alexander and Clarence Alexander were trying to get the net out of the water because they were aware of a pending closure. Ed and Clarence Alexander tried to remove the debris as fast as they could.  They started by removing most of the big pieces so they could put the net into the boat and then clean out the debris later.  Ropes tied the net to an anchor near the shore and an anchor in the river.[28]  Clarence Alexander sat in the boat while Ed Alexander stood up and removed debris from the net, starting on the side closest to the shore.  He removed sticks and debris from the net by pulling the net up briefly to remove the debris then setting that portion of the net back down into the river.[29]

---

[26] Swinging the net out to release the debris was not an option because of the great amount of weighted debris the net held. Swinging the net out would likely have lost the net.  In that instance the net would form into a giant ball, sink to the bottom of the river and roll downstream.

[27] To remove the net that is that full, you have to unweave the debris. The way you usually take out the net is to come up to the end of the net, you pull the weight in, then you just work your way up the net-taking the fish out of the net as pulling it out.

[28] A net in this fashion is also called a 'setnet.'

[29] It would have been immensely difficult to pull the net out of the water while it was laden with debris.

When a net was in this condition it was incapable of catching fish, despite the fact it was in the water because it was so laden with debris and pulled against the shore. Even during the process of removing debris, it is highly unlikely a fish would swim into a net in the process of being vigorously removed from the water while attempting to remove the debris contained in the net, as Ed Alexander was doing. It would be unheard of for a fish to swim into the net while it was against the bank, but remained in the water. Once Ed and Clarence Alexander reached the net they continuously tried to retrieve it and were not trying to catch fish with the net.

Ed Alexander had worked his way up to about one third to one half of the way up the net, when Williams and Officer Mimi Thomas, of the United States Fish and Wildlife Service, pulled up to the Alexander's boat and asked what they were doing.[30] Officer Thomas believed nets larger than four inches had to be pulled out of the water, partly because a gillnet can usually still catch fish if it is in the water. Officer Thomas believed that even when a gillnet

---

[30] On July 14, 2013, Paul Williams, Sr. worked for the U.S. Fish and Wildlife service as a riverboat driver. At approximately 10:00am, Williams left Fort Yukon with Officer Mimi Thomas and traveled down the Yukon River to check fish wheels and nets to make sure they were in compliance with the July 12, 2013 closure. Williams did not see anyone else fishing after 6:00pm during his trip. Officer Thomas was not considering whether those who fished were qualified as rural subsistence fishermen under the federal subsistence provisions. Officer Thomas was in her duty uniform and wore her sidearm.

is choked full of driftwood or washed up to the bank it may still be capable of catching fish.

Around approximately 6:30pm, Williams and Officer Thomas drove into an area of the river where the main channel of the Porcupine River goes into the Yukon River. The rivers were high and contained a lot of debris. Williams drove Officer Thomas into the lower mouth of the Porcupine River. Williams then landed the boat below the site near where they saw Clarence and Ed Alexander cleaning debris from a fishnet set in the water.[31] Officer Thomas exited the boat to contact the Alexanders to ascertain whether their net was in compliance with the 6:00pm closure.[32]

Ed Alexander responded that he was trying to get the net out of the water, but it was filled with debris. Officer Thomas approached the Alexanders from the nearest point on the beach and stood on the beach and asked them questions. Officer Thomas first

---

[31] Officer Thomas recalled the time as being 7:30pm. She carried a watch and two cell phones each of which had a clock and she wrote down the contact time on the citation. She is in the habit of checking the time before she contacts anyone. Additionally, a pilot contacted her at 6:00pm on July 14, 2013 to inform her that all the fish wheels in the area were shut down and she specifically recalled that she was downstream, more than an hour travel time by boat away from the site of Clarence Alexander's net when she received that that call.

[32] The officer testified "my goal that day was to check to see if all fisherman were in compliance with the 6:00pm closure." Transcript at 32. The closure notice meant to Officer Thomas that if the net was four-inch and less was okay, but anything larger than four was closed.

said "Hello, how are you?" or words to that effect and then told them she was there to check net sizes. Officer Thomas asked what size their net was, and Ed Alexander answered "I don't know" and "Why did you [Officer Thomas] want to know?" so she explained about the 6:00pm closure. It was approximately 7:30pm at this time.[33]

Ed Alexander continued cleaning the net, while Clarence was sitting in the boat. Officer Thomas asked them again "what size was the net?" or words to that effect. Ed Alexander became irritated and responded to Officer Thomas that the net was completely filled with debris and they had not caught anything because there was no way the net could have caught anything since it was pressed against the bank full of debris. Ed Alexander also started complaining about commercial fishing in the lower river. Officer Thomas asked Ed Alexander to measure the net for her and he refused.[34] Officer Thomas waited until they completed cleaning the net, were untying it, and then she asked the Alexanders to talk with her about the net size. However, they refused to answer her questions about the net size.

---

[33] Ed Alexander estimates the time was roughly 6:00pm, however he was not wearing a watch or other timepiece.

[34] Ed Alexander was irritated that she had asked him to measure the net and did not understand her question or how she wanted the net measured. Ed Alexander believed just by looking at the type of net, which was partially out of the water, Officer Thomas could tell it was a six-inch mesh net.

Officer Thomas measured the net and found it was a six-inch gillnet. Officer Thomas found the net violated the closure and told them so and told them she would be contacting them the next day. Officer Thomas found a sign attached to a Willow tree, growing in the ground, near where the net was tied to it; the sign stated "Clarence Alexander's Fish Net."[35] At no time did Officer Thomas see any fish in Clarence Alexander's net.

It took Clarence and Ed Alexander over an hour and a half to clear their net of debris and fully retrieve it.

## DISCUSSION

The July 12, 2013 the Announcement, Government Ex. 2, was a fisheries management action issued under the delegated authority of the Federal Subsistence Board and the closure of Subdistrict 5-D Middle was effective July 14, 2013 at 6:00 P.M.[36] On July 14, 2013, Clarence Alexander's net was located in the Yukon Flats National Wildlife Refuge in the mouth of the Porcupine River, on federal public lands. The location of Clarence Alexander's net

---

[35] Officer Thomas recognized Clarence Alexander's sign. A week earlier, Officer Thomas found a few unmarked nets in the area and told Clarence Alexander to identify his net. When she saw the nets a few days later, Officer Thomas saw a similar sign, on a cardboard box, handwritten with a marker, with similar handwriting, on one of Clarence Alexander's nets.

[36] The closure for Subdistrict 5-D Middle included "from the Hadweenzic River upstream to 22 Mile Slough and including the Porcupine River and all other adjacent tributaries, which includes the communities of Venetie, Fort Yukon, and Chalkyitsik." Government Ex. 2 at 2. This included the location of Clarence Alexander's net.

fell under the jurisdiction of the Federal Subsistence Board and as a result was subject to any restrictions, closures, or changes authorized by the Federal Subsistence Board.

Clarence Alexander is alleged to have violated the Announcement, Government Ex. 2, issued on July 12, 2013 in two ways. First, that Clarence Alexander fished after 6:00 P.M. in an area closed to subsistence fishing.[37] Second, that Clarence Alexander operated a gillnet in the water with a mesh size greater than four inches and a length greater than 60 feet after 6:00 P.M. on July 14, 2013.[38]

As to the first alleged violation, the United States charges Clarence Alexander violated 50 C.F.R. § 100.19(g) barring the taking of fish and wildlife in violation of any Board-authorized closure. Clarence Alexander argues that he was not fishing and not trying to "take" fish as described in 50 C.F.R. § 100.25(a), which provides in relevant part "*Take* or *Taking* means to fish, pursue, hunt, shoot, trap, net, capture, collect, kill, harm, or attempt to engage in any such conduct."[39]

---

[37] Government Ex. 2 at 2.

[38] Government Ex. 2 at 3.

[39] 50 C.F.R. § 100.25(a) [Italics in original]. He also argues the closure announced on July 12, 2013 did not apply to him for procedural reasons, including because the notice was a "state" closure notice instead of a federally-authorized notice and that the notice did not follow procedural requirements of 50 C.F.R. §

The United States argues violating a closure is a "strict liability" criminal offense.[40]  Quoting <u>Staples v. United States</u>, 511 U.S. 600, 607 (1994), the United States argues "the defendant has the burden to ascertain at his peril whether [his conduct] comes within the inhibition of the [law]."  The United States concludes it had no duty to put the defendant on notice that the defendant's conduct violated the law.[41]  Also citing <u>Staples</u>, Clarence Alexander argues there must be proof of Clarence Alexander's *mens rea* to find him guilty of the offense.

In the <u>Staples</u> case, the defendant was charged with possession of a machine gun.  The court addressed whether the National Firearms Act, 26 U.S.C. § 5861(d), required proof that a defendant knew the characteristics of his weapon such that it qualified as a "firearm" regulated under the Act.[42]  The United States argued that no *mens rea* element was required because the type of offense fit in the category of "public welfare" or "regulatory" offenses for which Congress imposed a form of strict criminal liability.[43]

---

242.17(a) – (d).  Because of the disposition of this matter, these issues need not be reached in this case.

[40] Plaintiff's Argument at 5.

[41] Plaintiff's Argument at 5, citing <u>Staples</u>, 511 U.S. at 607 (quoting <u>United States v. Balint</u>, 258 U.S. 250, 254 (1922)).

[42] <u>Staples</u>, 511 U.S. at 623.

[43] <u>Staples</u>, 511 U.S. at 606.

The Staples court founds *mens rea* was a required element to prove a violation of the National Firearms Act, however noting that the holding was a "narrow one."[44] The court noted "the small penalties attached to such offenses logically complemented the absence of a *mens rea* requirement," and contrasted such typical penalties with the maximum possible penalty of ten years imprisonment.[45]

Here, Clarence Alexander faces a much less severe maximum possible penalty, as he is charged with one count of a petty offense. Because the Staples holding was a narrow one, it is inapplicable here and the court concludes *mens rea* is not a required element of proof whether Clarence Alexander was taking fish.[46] However, because the regulations also bar an attempt to take fish, and attempt is a specific intent crime, the United States would need to prove intent to take fish to prove an attempt to do so.[47]

---

[44] Staples, 511 U.S. at 619.

[45] Staples, 511 U.S. at 616, 619.

[46] The United States asserts "taking" also means "to fish." Plaintiff's Rebuttal argument, at 2. However, the C.F.R. does not use the term "fishing" when describing subsistence taking of fish; "fishing" is only used to describe commercial fishing operations in the C.F.R. The C.F.R. uses both "taking fish" or "attempting to take fish." Although the Announcement imprecisely used the term "fishing," the regulation is sufficiently clear.

[47] In an attempt case there is no crime apart from the attempt, which is the crime itself. A defendant must act with the purpose of violating the substantive offense even though *mens rea* is not

At trial, there was no evidence offered that Clarence Alexander in fact took any fish. Accordingly, although no *mens rea* is required to prove violation of the closure order, there was not proof beyond a reasonable doubt that Clarence Alexander took fish in violation of the closure order.

The United States also contends that Clarence Alexander, who had a net in the water after 6:00 P.M. on July 14, 2013, was attempting to take fish. To prove this claim, the United States was required to prove beyond a reasonable doubt that Clarence Alexander (1) knew of the terms and conditions of the closure order; and (2) intended to take fish after 6:00 P.M. on July 14, 2013. It is a close question as to whether Clarence Alexander knew of the terms and conditions of the closure order. The evidence reflected that the closure order was not posted in the usual places, and Ed Alexander had conflicting information from other fishermen about the times to which the closure order would apply. However, the evidence also reflected that Clarence Alexander understood that there was a closure order, that it would apply some time that evening, and that he intended to have his net out of the water by 6:00 PM. Based on these facts, the court

---

required for the substantive offense. <u>United States v. Garcia</u>, 400 F.3d 816, 819 (9th Cir. 2005).

concludes that Clarence Alexander had sufficient notice that the closure order would apply as of 6:00 PM.[48]

The court finds reasonable doubt as to whether Clarence Alexander intended to take fish after 6:00 P.M. in violation of the closure order. The court relies on the testimony of Clarence Alexander, Ed Alexander, and Williams, all experienced fishermen, and finds that the river had a high level of debris such that the net was full of branches and incapable of holding fish. Clarence Alexander had checked the net earlier in the day and it appeared to be working with no issues. Subsequently, a vast amount of debris filled the net, and it was full as of 6:00 P.M. and incapable of taking fish. It required longer than an hour and a half for Clarence Alexander to remove debris and the net from the water. Ed and Clarence Alexander were actively trying to retrieve their net during this time period.

---

[48] The court does not reach the procedural issue of whether the notice was appropriate or sufficient under the law. As a factual matter, however, the court notes with some concern the short time period afforded subsistence fishermen in this case. Many of the procedural protections proffered by the United States here, including offering that those with questions could call an office, may not be workable in rural Alaska. It appears that the normal course of dealing between the Government and tribal concerns, which Clarence Alexander has asserted were not followed here, may address the unique relationship of rural Alaskans with the subsistence lifestyle and address notice requirements expected when the Government will affect the ability of residents to provide for their communities.

Their activity included attempting different methods of removing the debris such as dislodging the largest pieces of debris then attempting to retrieve the net. When that failed they tried to untie and swing the net to let the debris fall out downstream. When that failed they started removing the individual pieces of debris working from one side to the other. The evidence showed that Clarence Alexander and Ed Alexander were in the process of cleaning the net and removing it from the water during this time. It appears even if Officer Thomas made contact with Ed and Clarence Alexander as late as 7:30pm, there is certainly reasonable doubt as to whether Clarence intended to take fish after 6:00pm.

In light of Clarence Alexander's efforts to arrive at and retrieve the net before 6:00 P.M., and demonstrated efforts to remove the net thereafter, the court finds illogical the United States' argument that Clarence Alexander was intentionally protesting the closure. For these reasons, this court finds the United States did not prove that Clarence Alexander attempted to take fish after 6:00 P.M. on July 14, 2013, in violation of the closure order.

The United States also asserts a violation of the Closure Order in Government's Ex. 2, specifically, the provision providing that "during subsistence salmon fishing closures, fish wheels may not be operated and gillnets with a mesh size greater than four inches and a length greater than 60 feet must be removed from the

water."[49]   The United States argues Clarence Alexander violated this section by having his gillnet in the water after 6:00 P.M. regardless of his intent or purpose for having his net in the water.[50]

To prove this theory, the United States must prove beyond a reasonable doubt (1) the area was closed to subsistence salmon fishing; (2) Clarence Alexander had a gillnet in the water with a mesh size greater than four inches and longer than 60 feet.  The court has found that the area was closed to subsistence salmon fishing.  The remaining issue is whether Clarence Alexander had a gillnet in the water with a mesh size greater than four inches and longer than 60 feet.

Officer Thomas measured the net on-site and determined the mesh was six inches.  The court finds the United States has proven the mesh size.  However, there was no clear evidence offered at trial as to the length of the net.  Clarence Alexander and Ed Alexander testified they had pulled their boat alongside the net and were pulling up a portion of the net and cleaning it as they went, and they were about one third to one half complete on the

---

[49] See Government Ex. 2 at 3.

[50] "Defendant's 6-inch mesh net had to be out of the water by 6:00pm regardless of net length."  Plaintiffs Argument at 2.

task, when Officer Thomas arrived in the area.[51]  Officer Thomas testified that they were eight to nine feet from one end of the net when she arrived in the area.[52]  Even considered in the light most favorable to the United States, that they were one third complete, which would leave 16 to 18 feet remaining on the net, for a total length of 24 or 27 feet.  This is far less than 60 feet.

The United States argues that page three of the Announcement barred the use of nets with a mesh size in excess of four inches *or* a length in excess of 60 feet.  Changing the use of the word "and" to "or" would, in the United States's argument, require proof only of the mesh size.  This is not supported by the plain and unambiguous language used.[53]  The conjunction "and" immediately follows one qualifier (mesh size) and precedes another qualifier (length) without break, punctuation, or intervening noun.  It is conjunctive, and both qualifiers are required under the plain language of the Announcement.

---

[51] Transcript at 125.

[52] Transcript at 208-209.

[53] Generally, the plain meaning of a regulation governs its interpretation and other interpretive materials, such as the agency's interpretation of the regulation, should not be considered when the regulation has a plain meaning.  <u>Safe Air for Everyone v. U.S.E.P.A.</u>, 488 F.3d1088, 1097 (9th Cir. 2007).  <u>See also</u> <u>Wards Cove Packing Corp. v. Nat'l Marine Fisheries Servs.</u>, 307 F.3d 1214, 1219 (9th Cir. 2002).

The evidence reflects that Clarence Alexander had a six-inch mesh net. However, the length of the net was not established at trial. Because the Announcement barred the use of nets with a mesh size in excess of four inches and a length of 60 feet, the United States has failed to prove beyond a reasonable doubt that the net used by Clarence Alexander was in violation of this provision on page 3 of the Closure Order.

## **BRADY** VIOLATION

During defense cross examination of Officer Thomas, the defense discovered the agent had taken additional photographs and had recorded additional notes, none of which were provided to the defense. The photographs were taken on scene, and the notes were made contemporaneously with Officer Thomas' discussions with Clarence Alexander. Although these facts came to light during cross examination, the defense did not request additional time for the officer to gather the photographs, or make a proffer regarding the content of the photographs, or how the failure to disclose the photographs or notes prejudiced the case.

For lack of disclosure to constitute a true Brady violation, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully

or inadvertently; and prejudice must have ensued."[54]   Failure to turn over <u>Brady</u> materials is a constitutional violation if it deprives the defendant of a fair trial.[55]

Because of the context of the taking of the photographs and notes, and obvious subject matter, it is clear the materials would have been discoverable to the defense.  It could even be that the photographs had recorded the date and time they were taken, which could have been relevant to the disputed timing issues in this case.  The notes could have been used by the defense in preparing its witnesses and cross examination.  However, when the information came to light during trial, the defense did not request a break with adequate time to examine the materials, or a continuance, and defense did not make a proffer what the photographs or notes would show.  The materials were not submitted as evidence in the case.  Because the court can only speculate as to what prejudice could be suffered, the court does not find failure to disclose materials deprived Clarence Alexander of a fair trial.  Although the court agrees the material obviously was discoverable, there was no <u>Brady</u> violation.

---

[54] <u>United States v. Howell</u>, 231 F.3d 615, 624 (9th Cir. 2000).

[55] <u>United States v. Bagley</u>, 473 U.S. 667, 675 (1985).

**VIOLATION OF FEDERAL RULES OF CRIMINAL PROCEDURE 16(a)(1)**

In relevant part, FRCP 16(a)(1) requires:

(E) *Documents and Objects.* Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
> (i) the item is material to preparing the defense;
> (ii) the government intends to use the item in its case-in-chief at trial; or
> (iii) the item was obtained from or belongs to the defendant.

Here, Defendant requested photographs and notes, and some of which were provided to defense counsel. Government counsel "assured counsel for Alexander that the United States had produced the entire case file."[56] The additional notes and photographs identified during cross examination were in the possession, custody, or control of the government (even if only in the possession of the government agent), but were not disclosed. These items were material to preparing the defense, either in preparing a cross-examination of the lead government witness, or because as an on-scene witness, Officer William's observations and photographs taken at the time would have a significant relationship to key issues in the case affecting the outcome.

---

[56] Defense Argument at 7. The United States did not contest defense counsel's assertion.

When a Rule 16 violation occurs, the court has several options.[57]  As a remedy for the discovery violation, the court will not consider the one photograph provided by the United States, Government Exhibit 3.  This is just in these circumstances, because other photographs existed, but were not disclosed, and the United States selected the photograph that it believed supported its case to the exclusion of other, potentially exculpatory materials.

---

[57] Federal Rule of Criminal Procedure 16(d)(2)(D) (the court may order an inspection; grant a continuance, prohibit use of the materials, or enter any other order that is just in the circumstances).

## CONCLUSION

The court finds reasonable doubt whether Clarence Alexander took any fish or attempted to take fish in violation of the Closure order. The United States did not prove beyond a reasonable doubt that Clarence Alexander had a net with a mesh in excess of four inches and length of 60 feet in the water after 6:00 P.M. in violation of the closure order. For these reasons, the Court finds Clarence Alexander not guilty of violating 50 C.F.R. § 100.19(g)(1) on July 14, 2013.

Although the defense did not prove a violation of Brady, the United States did violate Federal Rule of Criminal Procedure 16(a)(1), and a remedy is ordered as set forth herein. The court finds because of the disposition of this case, it does not need to reach the procedural adequacy of the notice provided when the Government issued the Announcement.

DATED this 24th day of May, 2016 at Fairbanks, Alaska.

/s/   Scott A. Oravec_____
SCOTT A. ORAVEC
United States Magistrate Judge